OLIVER *v.* DETROIT TAXICAB CO.

1. DAMAGES — EXPERT WITNESSES — INCONSISTENT TESTIMONY — QUESTION FOR JURY.

In an action for personal injuries alleged to have been caused by plaintiff's being struck by defendant's taxicab, where plaintiff's expert witnesses agreed that she was suffering from nervous troubles originating from external violence, attributed by them to the shock, blow, or fall she received at the time of the accident, it cannot be said, as a matter of law, that the damages awarded were doubled or excessive because one expert diagnosed the trouble as "traumatic neuritis" and the other as "traumatic neurasthenia," each expressing the opinion that she might be afflicted to a degree with the related nerve disease or disorder which the other designated.

2. TRIAL—CREDIBILITY OF WITNESSES—QUESTION FOR JURY.

The credibility of witnesses on both sides, and the weight to be given to inconsistencies or conflict in the testimony of witnesses are for the jury.

Error to Wayne; Mandell (Henry A.), J. Submitted January 14, 1920. (Docket No. 108.) Decided April 10, 1920.

Case by Cora B. Oliver against the Detroit Taxicab & Transfer Company for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*A. W. Sempliner,* for appellant.

*James A. Murtha* and *John H. Dohrman,* for appellee.

STEERE, J. Plaintiff had judgment in the circuit court of Wayne county for $3,500 awarded by verdict of a jury as compensation for personal injuries sustained when struck by one of defendant's taxicabs

while she was standing on the sidewalk waiting for a street car. Plaintiff's evidence showed she was at the time of the accident, on January 27, 1917, a woman over 50 years of age, in good health, living at 673 Second avenue with and caring for the home of her brother, Henry Sibley, then a business man in Detroit. She was an educated woman of business experience and attainments, had been employed in mercantile credit and research work, and was at that time preparing a book for publication on some subject of domestic efficiency, a line in which she had been engaged more or less for several years. On the day of the accident she was down town in the forenoon making some purchases and shortly before noon went to the corner of Griswold street and Grand River avenue to take a car home. Seeing a car for the direction desired coming, she looked along the street and noticed no approaching vehicles near on that side except two slowly moving junk wagons and stepped into the street to signal the car and as she watched saw a rapidly approaching auto, which she later recognized as a taxicab, then at the corner of Grand River and Woodward avenue, a block away. She then stepped back and stood on the curb to let it pass, as it would before the street car stopped. The taxi, driven at a high speed, passed the street car and then the junk wagons near by her, turning in as it did so towards the curb on which she was standing. Seeing it was coming into the curb, she started to step farther back on the walk when some part of the taxi struck her right foot just as she was raising it in stepping back, in such manner that she was thrown heavily backward with such force as to become unconscious, from which blow and fall she received serious and permanent injuries, as claimed. She was able to give some one her brother's name, but testified she had no recollection of anything which happened after he arrived

until she found herself at home and in bed that night, and was conscious of little which occurred for several days. She was confined to her bed for about a week and was able to get around in about three weeks. She testified her chief suffering was from severe backaches, pains at the back of her brain and down her neck, that she was unable to hold her head in a fixed position for any length of time, and describes her condition in part as follows:

"I could neither read or write; the first that I became convinced that there was anything particularly serious was when I undertook to take up my work and go over some notes I had made and write a letter, I found I could not, I do not know just how to express it but the pain in the back of my neck and back of my head was so severe that it was impossible for me to work five minutes consecutively. The pain was just from the base of my brain down below the curve of my neck, there was a lump about that large, about the size of a hen's egg, the lump has not entirely disappeared now. Dr. Spitler treated me about nine months and was able to reduce it. I was unable to walk in any direction I wanted to go without slueing off, to the left; had not proper control of my right leg. * * * I am now better than I was, but I have never known a moment's freedom from pain since I was injured, I have never been able to go to bed at night and lie in a normal position because the pain in my back prevents it."

Defendant's counsel raised no issue upon the manner in which the accident occurred and says in his brief:

"The question of the liability of the defendant is not in issue. The only question was the nature of the injuries and the extent of the liability for which plaintiff obtained judgment for $3,500. * * * The question involved here, as we see it, is, Can a plaintiff go to a jury upon two inconsistent and conflicting theories as to the injuries she has sustained, both theories sworn to on her behalf, and receive from the jury damages for both?"

Aside from plaintiff's testimony, and some undisputed formal proof identifying the taxicab, the testimony on both sides was by authorized and legally recognized practitioners in the art of healing.

We agree with a comment of the trial judge that the case was "nicely presented, and apparently presented by counsel on both sides with a great degree of earnestness and fairness." And it may be added that the acerbity in the case developing an opening for defendant's counsel to emphasize, and urge, inconsistent and conflicting theories submitted to the jury on plaintiff's evidence, was furnished by the "regular school of medicine" opinions as to the testimony of Dr. Spitler, an osteopathic practitioner, and osteopaths in general. Plaintiff was a believer in osteopathy and resorted to that method of cure for her accidental injuries. She early employed Dr. Spitler, who treated her for some months, and later while in the east was treated by other osteopaths. Five professional witnesses testified, four of whom were of the "regular school" of medicine and surgery. Dr. Spitler, the osteopath, and Dr. Ives, of the regular school, testified in behalf of plaintiff. Drs. Reed, Kennedy and Stevens, with whose views as to the Dr. Still school of healing Dr. Ives was in full accord, testified for defendant. Of the five Dr. Spitler only had treated plaintiff professionally, commencing after she was able to visit his office and continuing regularly for some months. He diagnosed her affliction as "traumatic neuritis," testifying in part as follows:

"She came to me complaining of a very severe case of neuritis, affecting both the brachial plexus and the sciatics. The brachial plexus is, of course, the nerve supplying the arm and the hand. She gave me a history of having had a very severe accident some time. She gave me the history of being struck by a taxicab, thrown back on the sidewalk, struck very severely on the back. I found her suffering from neuritis, af-

fecting the arms and leg especially. I think it was the right leg. * * * My treatment consisted of correcting the bony lesions that were present. That is variations due to the injury. The pelvis was badly rotated. I think it was to the right. Rotated on the sacrum, which set up a lot of sciatic neuritis. Then there is a secondary condition to that showed above the primary and secondary curve in the upper—the dorsal and cervical region, which I attributed as the cause of the brachial neuritis, which affected the arm. When I use the terms I do, I have reference to the spinal column, including the cord, the vertebrae and the muscles, the tissue, the nerves radiated from the backbone or the spine. * * * My treatment consisted in applying osteopathic methods to the portions affected. The troubles yielded slightly under my treatment. When she left she had not entirely recovered. She had a great many of the nervous symptoms which in all probability she will carry for a long time. But much of the neuritis had been corrected. It was much better, but it was not all gone. Cases of neuritis are usually a rather slow process of treatment. Neuritis is not the same as neurasthenia. * * * Neuritis is an affection of the nerve trunk itself; of the sheath. There is a low grade inflammation in the sheath itself, while neurasthenia is a nervous affection and comes under the head of nervous diseases. Of course, a bad case of neuritis is very, very irritating, and might possibly result in a case of neurasthenia. Neurasthenia is a general nervous condition. * * * A general run-down condition may result in neurasthenia. I examined Mrs. Oliver yesterday. I think possibly she is a little better than when she left me. That is, the neuritis condition is improved. She is generally nervous yet. I think she will be for a long time."

On cross-examination the witness further explained that he found plaintiff's spine about three-quarters of an inch out of center of base, which he attributed to "rotation of the right innominate on the sacrum"; and on being shown a report he had made to defendant's counsel, stated it was the left innominate that was affected and which he corrected, saying "I had

to replace it a number of times, it had a tendency to recur. I replaced it, it finally stayed in pretty good. The innominate are connected to the sacrum by articulation; the right can be displaced without the left."

Dr. Stevens, a specialist of X-ray work, explained certain X-ray plates of plaintiff taken under his direction and testified that they disclosed no injury to the spinal column, no evidence of fracture, dislocation or curvature, nor injury in the region of the sacrum of which Dr. Spitler had testified.

Dr. Reed, who saw plaintiff "just once" and made physical examination, testified he could find no objective symptoms of any dislocation whatever, explained at length the effect of displaced vertebrae on the spinal cord which "would manifest itself by the appearance of paralysis of the various muscles which were supplied by the nerves from this same sector"; and of his detailed discussion of the subject said:

"I am criticizing osteopathy treatments because I do not believe in their method of treatment. * * * When they try to correct or reset anything in the way of curvature or anything of that sort. I think that is time wasted."

Of his conclusions as to plaintiff's condition he said:

"There is no question in my mind but that probably she was suffering at the time that she came to me. The question in my mind is the cause of the suffering."

Saying further that in his opinion the symptoms she told him of were "due entirely to the menopause, the change of life in this case."

Dr. Kennedy, who also made a physical examination of the plaintiff, testified he found no objective evidence of injury, attributed her nervous condition so far as disclosed to the same cause as Dr. Reed, and expressed like views as to the testimony of Dr. Spitler, saying that if the left innominate was dislocated at the sacral joint it would be absolutely impossible

for her to walk when and as related, and "If his (Dr. Spitler's) testimony were true she would be a very much disabled woman, in my judgment."

Dr. Ives, a practicing physician of the regular school of medicine, "a neurologist, a psychologist in the treatment of mental and nervous diseases," testified that he had recently made thorough examination of plaintiff and said:

"Her present condition, of what I call traumatic neurasthenia, or nervous exhaustion from a blow, both physical and mental, is due to the blow, to the trauma, or the concussion of the brain at the time, and to the mental shock and fright of the thing at the time, and contemplating and recontemplating of it ever since, and the condition of inefficiency is, in my opinion, certainly due to the blow, and not to the menopause, as was said."

Asked by counsel if he could state to the jury in terms they might perhaps better understand the effect of such blow on the nervous system and resulting neurasthenia, the doctor thought perhaps he could as he was "in the habit of saying it to the class," and "to use a term for the laity," likened this "subtle, intangible something" to "short circuiting of a battery," a "shell shock in the great war," at times "injurious to the construction of the very protoplastic construction of the cells themselves, so they do not act efficiently," with other elucidations, finally saying:

"I know of no better way than simply to state that it renders a person who was previously efficient, into a person of comparative inefficiency; and despondency, headaches, backaches and all that sort of thing. These are the classical symptoms of such a condition. The accident was over two and a half years ago, that is long enough for her to have recovered completely if she is to recover. Just what the future has in store for anybody cannot be known, but as a matter of fact I do not believe Mrs. Oliver will ever be the efficient woman that she would have been had she not received the blow."

Under a somewhat extended cross-examination the doctor adhered to and further elucidated his diagnosis of traumatic neurasthenia and declined with no uncertain sound to be led into any truce with osteopathy, saying in part:

"I know perfectly well that osteopaths invariably find dislocations of the spine, misplaced vertebrae for headache, toothache, or any other of the pains. I never had one come to my office yet from an osteopath who had not had a misplaced or sprained innominatum. * * * This woman had concussion of the brain and the tremendous emotional shock of being thrown heavily on the ground, lighting on her back, striking the back of her head on the stone sidewalk, that is enough to produce temperamental emotional changes that she had, without dislocation of the innominate or cervical vertebrae. * * * I am offering to say in this court I have that opinion of osteopathy, it angers me to hear anything of this sort; it is not the case. It is this dislocation of the vertebrae impinging on the spinal nerve that gets my goat every time. * * * I did not say that there was no neuritis, but that is not the principal thing that is the matter with her; the thing that has knocked this woman out, making her valueless, useless to herself in the world is the traumatic neurasthenia. In my opinion she may have some neuritis, she may have traumatic neuritis, she may have traumatic neuritis from the blow on the nerve, but this neuritis over and over again—it is overdone."

Defendant's assignments of error are all directed to the charge of the court in submitting the case to the jury, permitting them as is claimed, "to speculate as to which of plaintiff's experts was telling the truth" in reference to her injuries, allowing them to "assess damages for two conflicting and different kinds of injuries, one of which at least did not exist under the testimony of the witness produced by plaintiff"; and in permitting them to consider the testimony of Dr. Spitler as to curvature of the spine and dislocation of

the innominate bone, "in view of the fact" Dr. Ives testified such condition did not exist.

Error is particularly assigned on a portion of the charge wherein the court, when stating plaintiff's claim, referred to it as "sort of two-fold," saying:

"One is that she received certain physical injuries, a curvature of the spine, and other things that you have heard about; and that, as a result of those things she has suffered certain mental troubles—not so much mental as nervous troubles; and that she is now suffering—of course I am dealing with her claim—she says that she is suffering from neurasthenia, brought about as a result of the blow that came at the time she says that she struck her head on the pavement. * * *

"Now, the other theory that she proceeds on is not only that she did actually suffer from a nervous disease known as neurasthenia, but she claims that ill is with her today and has not been cured. She says in all reasonable probability that ill or ailment will remain with her for some time to come."

The court also plainly and correctly stated the denial, claims and theory of the defense, told the jury they were the sole judges of the truth of the facts in relation to which testimony was given, and also of the weight to be given opinion testimony by those testifying as experts, saying further:

"It will be your duty to determine as to the reasonableness of the theories that are advanced, and when one gives you an opinion of a certain thing, and another gives you an opinion that is quite contrary, why, these opinions—do they appeal to your sound judgment and common sense, or, I might be pardoned by saying to you 'horse sense.' * * *

"You are here now to determine who is right in this disagreement. Is the plaintiff right when she says that the ills that she claims that she is now suffering from are due solely and alone to this accident, or is the defendant right when it claims that her ills, if she has any, are due to causes other than those stated."

210—Mich.—7.

The real issue for the jury, made plain we think both by the testimony and charge, is, How badly was plaintiff hurt, how seriously and permanently was she injured? We find nothing in the instructions indicating to the jury that they were at liberty to make a double award on two conflicting theories. The court carefully avoided references to the testimony of particular witnesses or the claims and theories of the conflicting methods of healing which experts had discussed, and repeatedly emphasized the duty of the jury to determine the facts of the case, and as they found the facts determine what, if any, injuries plaintiff suffered from the accident which befell her.

When it comes to dealing in a practical way with the controlling ultimate facts for the jury, rather than theories, the testimony of plaintiff's witnesses was not so divergent as Dr. Ives' insistently proclaimed theories in condemnation of osteopathy might on first impression seem to indicate. Dr. Spitler saw plaintiff shortly after the accident and was the only one of the witnesses who then saw or ever ministered to her professionally. He assumed to testify to facts—to her then condition as he saw it. He said she was suffering from neuritis affecting especially her arm and leg, caused as he then found and describes in his phraseology, by sciatic neuritis, or inflammation of the sciatic nerve, produced by the pelvis being badly rotated, and bony lesions or variations of the spine due to the injury she received; he told of his method of treatment with palpation, adjustments, etc., including replacement of the left innominate which was affected, said that in what he was describing by the terms he used he had reference to the spinal column including the cord, vertebrae and muscles, tissues and nerves radiating from the spine, that in time his efforts to correct the variations he found resulted in that portion of her injury being largely recovered, the serious

remaining trouble being traumatic neuritis. He at no time used the word "dislocation," which the doctors' of the regular school stressed in such disapproving terms, apparently as inferable from the terms he used. He also did say, "of course, a bad case of neuritis is very, very irritating and might possibly result in a case of neurasthenia," and Dr. Ives said, "In my opinion she may have some neuritis, she may have traumatic neuritis from the blow on the nerve."

Dr. Spitler diagnosed the trouble he was treating plaintiff for as "traumatic neuritis," and Dr. Ives, who examined her some two years later, found her suffering with "traumatic neurasthenia," both nervous troubles originating from external violence—attributed by each to the shock, blow or fall she received at the time of the accident, and each in effect expressed the opinion that she might also be afflicted to a degree with the related nerve disease or disorder which the other designated. They concur in denying that her condition was attributable to the menopause or change of life, as defendant's experts contended.

The jury saw plaintiff upon the witness stand and heard her plain tale told in terms of "the laity" as to her impaired physical condition and sufferings resulting from the accident, supported in its broad essentials by the testimony of her expert witnesses who, though of divergent creeds in the art of healing and technically at difference in many particulars, harmoniously testified to her past and present suffering and broken health from a serious and painful nervous malady of traumatic origin, which by subjective and objective diagnoses they ascribe to injuries sustained at the time of her accident. "Trauma" is said to mean an "abnormal condition of the living body produced by external violence, as distinguished from that produced by poisons, zymotic infection, bad habits and other less evident causes." Century Dictionary. Con-

tradicting the evidence plaintiff produced was that of defendant's witnesses, with expert testimony in explanation and denial, carrying the whole controversy into the field of disputed facts for the jury.

If the jury fully credited plaintiff's testimony and that of her witnesses as to her suffering and physical condition resulting from the accident, it cannot be said as a conclusion of law that the damages they awarded were doubled or excessive. The credibility of the witnesses on both sides, and the weight to be given to inconsistencies or conflict in the testimony of witnesses called by her, as presented in this case, were purely questions for the jury.

The judgment is affirmed.

MOORE, C. J., and BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.